IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

          **v.**                   **Criminal No.** 21-017 (FAB)

SIXTO JORGE DÍAZ-COLÓN,

    **Defendant.**

OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Sixto Jorge Díaz-Colón ("Díaz")'s motion to dismiss the indictment. (Docket No. 103.) Díaz also moves the Court to "correct" an inaccurate transcript. (Docket No. 87.)  For the reasons set forth below, both motions are **DENIED.**

I.  **Background**

On July 4, 2019, media outlets released a trove of disparaging and profanity-laced Telegram messages by Puerto Rico Governor Ricardo A. Rosselló ("Rosselló") and his associates. (Docket No. 1 at p. 3.)[1] The content of these messages galvanized mass protests and a political maelstrom.  Rosselló announced his resignation on July 24, 2019, calling for "citizen reconciliation."  Patricia

_____

[1] Telegram is a "cloud-based instant messaging and voice-over-Internet Protocol (VoIP) service that allows its users to send messages, exchange photographs, videos, documents, and other files through the Internet." (Docket No. 1 at p. 2.)

Mazzei, *et al.*, "Ricardo Rosselló, Puerto Rico's Governor, Resigns After Protests," New York Times (Jan. 24, 2019) (available at https://www.nytimes.com/2019/07/24/us/rossello-puerto-rico-goven or-resigns.html) (last visited June 16, 2022).   This criminal action pertains to an alleged attempt to extort an official within the Rosselló administration.

The Spanish Broadcasting System, Inc. employed Díaz in an unspecified capacity "until or about July 18, 2019." (Docket No. 1 at p. 1.)  He purportedly served as a conduit between Person 1 and Person 4, a former government subcontractor and the Executive Director of the Ports Authority, respectively.  Id. at pp. 1-3.[2] Person 1 is also the son of "Person 2," a former official in the Rosselló administration.  Id. at p. 1.  The following allegations are set forth in the indictment.

On February 3, 2019, Person 1 and Díaz met at the latter's apartment to discuss Telegram messages containing "incriminating information about" the governor.  (Docket No. 1 at p. 2.)   At this meeting, Person 1 showed Díaz a binder containing copies of the Telegram messages.  Id.  Subsequently, Díaz sent a text to Person 1 with the following message: "Brother, don't get lost. Let's grab coffee and we can catch up.  Let's be strategic in the

---

[2] Person 4 also served as the Secretary of Public Affairs for the Governor's mansion.  (Docket No. 1 at p. 1.)

next step. #Letsgoforward." <u>Id.</u> at p. 2.  Four months after this
meeting, Díaz texted Person 4 the following message:

> Dude, if Fortaleza doesn't stop messing with Person 2,
> Person 1 has overwhelming evidence to fuck this
> Administration starting with [Governor Rosselló]."
> According to Person 1, it is you and Fortaleza behind
> the attack against Person 2.

<u>Id.</u> at pp. 2—3.

Díaz met with Person 4 on June 21, 2019, at a restaurant in
San Juan.  <u>Id.</u> at p. 3.  He informed Person 4 that Person 1 "had
a binder full of Telegram messages that would destroy [Rosselló]"
and his political party.  <u>Id.</u> at p. 3.  Díaz also "asked Person 4
to help him with several government contracts through which he
received compensation."  <u>Id.</u>

Media outlets published the Telegram messages on July 8, 2019.
<u>Id.</u> at p. 3.  The indictment avers that Díaz then attempted to
"extort additional money from Person 4 to prevent the release of
additional Telegram messages."  <u>Id.</u>

On July 16, 2019, Díaz met with Person 4.  <u>Id.</u> at p. 4.  Díaz
revealed that: (1) Person 1 "possessed Telegram messages that had
not yet been released publicly," (2) Person 1 obtained the messages
from his father's cellphone, (3) the unreleased messages
"contained damaging information" about Governor Rosselló and
Person 4, (4) Person 1 "intended to 'burn down Puerto Rico,' by
releasing these Telegram messages unless [he] received

approximately $300,000," and (5)  Díaz offered to accept this
payment "through a corporation that [he] owned and did not have
any contracts with the government." Id.  In addition to the demand
for $300,000, Díaz attempted to extort a "talent" fee, payment for
favorable commentary by "other well-known individuals" in the
media. Id. at p. 4.  Lastly, Díaz requested the reinstatement of
government contracts with the Puerto Rico Department of Treasury
and the Puerto Rico Office of Management of Budget. Id.  These
contracts inured to Díaz's financial benefit. Id.  In fact, Díaz
later sent Person 4 a Telegram message to identify the relevant
companies with expired government contracts. Id.  Ultimately,
Díaz attempted to obtain on behalf of Person 1 and himself: (1)
$300,000 in hush money, (2) a talent fee, and (3) the reinstatement
of certain government contracts.  Person 1 declined Díaz's offer.
Id.[3]

FBI agents contacted Díaz on July 26, 2019.  (Docket No. 107.)
After this meeting, he purportedly "deleted Telegram messages
containing information about his involvement in the scheme, before

---

[3] Díaz may be found guilty if the jury finds that he attempted to extort property
on behalf of a third-party (i.e. Person 1). See United States v. Valentini,
944 F.3d 343, 350 (1st Cit. 2019) (holding that the Hobbs Act does not require
the defendant to have "received any personal benefit or take personal possession
of the property: directing the transfer of property to a third party is enough")
(citing United States v. Tkhilaishvili, 926 F.3d 1, 10 (1st Cir. 2019) (holding
that a defendant may 'obtain' property within the meaning of the Hobbs Act by
bringing about its transfer to a third party, regardless of whether the
defendant received a personal benefit from the transfer")).

surrendering his cellular phone to the authorities." (Docket No. 107 at p. 2.)

A grand jury returned a three-count indictment on January 26, 2021, charging Díaz with attempted extortion in violation of 18 U.S.C. sections 1951 and 2 (count one), interstate extortion in violation of 18 U.S.C. sections 875(d) and 2 (count two), and destruction of records in a federal investigation in violation of 18 U.S.C. section 1519 (count three). (Docket No. 1.) Díaz moved to dismiss the indictment. (Docket No. 103.). The United States responded, and Díaz replied. (Docket Nos. 107 & 111.) The Court granted leave for the United States to file a surreply. (Docket No. 116.)

## II.   The Motion to Dismiss

Díaz moves to dismiss the indictment for seven reasons. (Docket No. 103.) First, he maintains that the grand jury failed to charge Díaz with conspiracy. Id. Second, he argues that count one fails to allege Hobbs Act extortion. Id. Third, Díaz argues that the facts undermine the United States' theory of criminal liability. Id. Fourth, the First Amendment allegedly protects Díaz from criminal prosecution. Id. Fifth, count two lacks a "wrongfulness" allegation. Id. Sixth, Diaz contends that dismissal is warranted for a patchwork of reasons that have support in neither the record nor relevant case law. Id. Finally, Diaz

claims that the United States engaged in prosecutorial misconduct.
Id.

### A. Legal Standard

The right to an indictment is rooted in the Bill of Rights
and appurtenant legislation.  Pursuant to the Fifth Amendment,
"[n]o person shall be held to answer for a capital, or otherwise
infamous crime, unless on a presentment or indictment of a Grand
Jury."  U.S. Cont. amend. V.  The Sixth Amendment also prescribes
that the accused shall have the right "to be informed of the nature
and cause of the accusation."  U.S. Cont. amend. VI. Congress
subsequently clarified that the indictment "must be a plain,
concise, and definite written statement of the essential facts
constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  A
defendant may request dismissal for *inter alia* a "lack of
specificity" or "failure to state an offense."  Fed. R. Crim. P.
12(b)(3).

The authority to indict rests exclusively with the grand
jury, a "constitutional fixture in its own right."  United States
v. Williams, 504 U.S. 36, 47 (1992).  This body conducts an
independent, secret investigation to determine whether there is
probable cause to indict.  In re United States, 441 F.3d 44, 57
(1st Cir. 2006) ("[The] whole theory of its function is that [the
grand jury] belongs to no branch of the institutional Government.

Thus, it remains functionally and conditionally at arms-length from the judicial branch.") (internal citation and quotation marks omitted).  By serving as an intermediary between the public and government officials, the grand jury prevents the commencement of "wrongful prosecution[s] by an overbearing state." United States v. Mills, 995 F.2d 480, 486 (4th Cir. 1993); see Rodger A. Fairfax, Jr., Grand Jury Discretion and Constitutional Design, 93 CORNELL L. REV. 703, 731 (2008) ("For those of the founding generation concerned about the potential aggrandizement of central governmental authority, the grand jury, much like the petit jury, represented a significant check on the federal criminal prosecution power.").

An indictment is sufficient "if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he [or she] must defend, and enables him [or her] to enter a plea without fear of double jeopardy." United States v. Ford, 839 F.3d 94, 104 (1st Cir. 2016) (internal quotation marks and citation omitted).  "[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002) (internal quotation marks and citation omitted); see United States v. Rodríguez-Rivera, 918 F.3d

32, 34 (1st Cir. 2019) ("Unlike a civil complaint that need allege facts that plausibly narrate a claim for relief, a criminal indictment need only apprise the defendant of the charged offense.") (internal quotation marks and citation omitted).

To adjudicate a motion to dismiss, courts "must take the allegations in the indictment as true," cognizant that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted). Notably, the indictment need not provide a preview of the evidence adduced at trial. See United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (noting that the "government need not recite all of its evidence in the indictment").

### 1. Failure to Charge Conspiracy

According to Díaz, "the indictment should be dismissed because the government failed to charge the defendant with conspiracy or attempted extortion." (Docket No. 103 at p. 4.) He faults the grand jury with failing "to charge the most important element of the crime they are imputing to [him], the conspiracy agreement to violate the law." Id. at p. 34. This argument is nonsensical. The United States has no obligation to charge

conspiracy or any other offense. See United States v. Lawrence, 179 F.3d 343, 348 (5th Cir. 1999) ("We allow the government discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek.") (citing United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.")).  It belies logic for a criminal defendant to request an additional charge.  Accordingly, the conspiracy argument is a strawman and immaterial to this criminal action.

### 2. Hobbs Act Extortion

Díaz asserts that the "allegations [in count one] do not plausibly state a claim of extortion."  (Docket No. 103 at p. 36.) This argument is unpersuasive.

Congress enacted the Hobbs Act in 1946 to amend and expand the Anti-Racketeering Act of 1934.  United States v. Brissette, 919 F.3d 670, 683 (1st Cir. 2019); see Sara E. Kropf, The Reach of Federal Extortion and Blackmail Statutes, 34 Crim. Just. 31, 33 (2019) ("Although the Hobbs Act has most famously been used in the union context, federal prosecutors have also made use of it aggressively in cases involving both public officials and private citizens.").  Pursuant to this statute:

> Whoever in any way or degree obstructs, delays, or
> affects commerce of the movement of any article or
> commodity in commerce, by robbery or extortion or
> attempts or conspires to do so, or commits or threatens
> physical violence to any person or property in
> furtherance of a plan or purpose to do anything in
> violation of this section shall be fined under this title
> or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Congress defined extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The Hobbs Act is expansive, extending "as far as Congress's power to regulate conduct under the Commerce Clause." United States v. Rodríguez-Casiano, 425 F.3d 12, 14 (1st Cir. 2006); United States v. Jiménez-Torres, 435 F.3d 3, 7 (1st Cir. 2006) ("Congress's intent in enacting the Hobbs Act was to use all of its constitutional power to punish interference with interstate commerce by extortion, robbery, or physical force.") (internal citation and quotation omitted). The United States "need only show a realistic probability of a de minimis effect on interstate commerce, in order to bring extortion within the reach of the Hobbs Act." United States v. Santana-Jiménez, 71 F. Supp. 2d 23, 26 (D.P.R. 1999) (Casellas, J.) (citation omitted).

During the house debate in 1945, Representative Sam Hobbs ("Hobbs") stated that extortion and robbery "have been

construed a thousand times by the Courts.  Everybody knows what
they mean." United States v. Coss, 677 F.3d 278, 289 (2d Cir.
2012) (quoting 91 Cong. Rec. 11,912 (1945)).  Indeed, extortion is
"one of the oldest crimes in our legal tradition." Sekhar v. United
States, 570 U.S. 729, 733 (2013).  Hobbs erred, however, by
underestimating the legal profession's ingenuity and penchant for
statutory interpretation.  For instance, the First Circuit Court
of Appeals once adopted a broad definition of "property," holding
that this term refers to "any valuable right considered as a source
or element of wealth." United States v. Hathaway, 534 F.2d 386,
396 (1st Cir. 1976) ("The right to pursue a lawful business
including the solicitation of customers necessary to the conduct
of such business . . . [is] property within the Hobbs Act
definition.").  Subsequent precedent from the Supreme Court set
forth a more narrow definition of this term.

      In Schneidler v. NOW, Inc., a jury found that anti-
abortion activists violated the Hobbs Act by obstructing access to
health care centers.  537 U.S. 393, 397-98 (2003).  The activists
argued, however, that the "right to seek medical services from
clinics, the clinic doctors' rights to perform their jobs, and the
clinics' rights to provide medical services . . . were not
'property' for purposes of the Hobbs Act." Id. at 399.  The Supreme
Court agreed, citing "two sources of law [used] as models for the

Hobbs Act: the Penal Code of New York and the Field Code, a 19th-century model penal code." Id. at 403. These authorities defined "extortion" as "the obtaining of property from another with his consent, induced by a wrongful use of force or fear or under color of official right." Id. Extortion encompassed both a "deprivation and acquisition of property." Id. at 403. In contrast, the crime of coercion entailed "the use of force or threat of force to restrict another's freedom to act." Id. at 405. The Hobbs Act incorporates the New York and Field Code definition of extortion, but not coercion. By omitting coercion from the statute, Congress recognized "the difference between these two distinct crimes." Id. at 406. The anti-abortion activists deprived the health care centers of the "right of exclusive control of their business assets, but they did not acquire such property." Id. at 405. At most, they committed the crime of coercion. Id.

Ten years after Scheidler, the Court revisited the "obtaining of property" requirement in Skehar v. United States, 570 U.S. 729. The general counsel for the New York State Comptroller recommended that an employee pension fund refrain from investing in a private firm. 570 U.S. at 731. A partner at this firm sent the general counsel "a series of anonymous e-mails demanding that he recommend moving forward with the investment and threatening, if he did not, to disclose information about his alleged affair to

his wife, government officials, and the media." Id.  A jury
convicted the partner for extorting the "General Counsel's
recommendation to approve the [investment]." Id.  The Seventh
Circuit Court of Appeals affirmed the conviction, holding that the
general counsel "had a property right in rendering sound legal
advice to the Comptroller and, specifically, to recommend – free
from threats – whether the Comptroller should [invest]" in the
private firm.  Id. at 732.

        The Skehar court reiterated that coercion and extortion
are distinct.  Id. at 734.  The property in a Hobbs Act prosecution
must "be transferable – that is, capable of passing from one person
to another." Id. at 734.  Coercion is a lesser offense, prohibiting
the use of threats "to compel another person to do or to abstain
from doing an act which such other person has a right to do or to
abstain from doing." Id. at 735.  In fact, the Supreme Court cited
People v. Scotti, 266 N.Y. 480 (1943), to illustrate which acts **do
not** constitute extortion.  In Scotti, the defendants violated the
coercion statute by compelling a manufacturer to contract with a
labor union.  Id.  In a similar vein, providing legal advice free
from duress is not a property right that is transferable.  Id.
(citing Cleveland v. United States, 531 (2000) (holding that "a
'license' is not 'property' in the State's hands and so cannot be
'obtained' from the State").  Accordingly, the Supreme Court

vacated the partner's conviction for Hobbs Act extortion. Id. at 738.

        The United States posits that Díaz "sought to obtain $300,000 from Person 4 and his associates, and also demanded that Person 4 work to restore government contracts benefitting the defendant, or risk financial and reputational harm through the release of certain damaging communications."  (Docket No. 116 at p. 4.)  Díaz maintains, however, that the contracts Person 4 "was going to assist [him] in being renewed by the Government cannot form the basis of a Hobbs Act violation because in this scenario the property had to be transferable."  Docket No. 103 at p. 36; see United States v. Burhoe, 871 F.3d 1, 27 (1st Cir. 2017) (reversing a Hobbs Act conviction because the property obtained by the defendant (i.e. contractual protections for employees with seniority) "cannot themselves be transferred").

        The Court need not determine whether a government contract is "property" within the meaning of the Hobbs Act for purposes of ruling on the pending motion.  The relevant inquiry is whether the indictment provides Díaz with adequate notice of the crimes charged and preserves his right to claim double jeopardy in a subsequent criminal prosecution. See United States v. Reséndiz-Ponce, 549 U.S. 102, 108 (2007) (holding that an indictment is sufficient if it "first, contains the elements of the offenses

charged and fairly informs a defendant of the charge against which
he must defend, and, second, enables him to plead an acquittal or
conviction in bar of future prosecutions for the same offense"))
(citation omitted).  Count one states that Díaz:

> Did knowingly and unlawfully obstruct, delay and affect
> and attempt to obstruct, delay and affect in any way and
> degree, commerce and the movement of any article or
> commodity in commerce, by extortion, as that term is
> defined in Title 18, United States Code, Section 1951,
> and aided and abetted such offense; that is, [Díaz]
> attempted to obtain **property** from Person 4 and others,
> with consent, induced by wrongful use of fear.

(Docket No. 1 at p. 5) (emphasis added).  Díaz speculates that the
term "property" in count one encompasses the expired government
contracts.  (Docket No. 1 at p. 6.)[4]  Dismissal of the indictment
cannot rest, however, on potential theories of the case; trial is
the appropriate venue to raise any legally legitimate theories of
defense that may undermine the United States' proof.

     The United States possesses broad discretion to
prosecute this criminal action within the confines of the
Constitution, the Federal Rules of Evidence, and the Federal Rules
of Criminal Procedure.  Whether the United States presents a
particular theory of the case at trial is irrelevant to the Court's

---

[4] The $300,000 certainly constitutes "property" for purposes of the Hobbs Act.
See, e.g., United States v. DiDonna, 866 F.3d 40, 47 (1st Cir. 2017) (affirming
a conviction pursuant to the Hobbs Act where the defendant demanded "hush money
in exchange for silence about information that could have damaged [the victim's]
business").

analysis.  See United States v. Platter, 514 F.3d 782, 787 (8th
Cir. 2008) ("Generally, the government is free to prove a
defendant's liability for one criminal offense by using multiple
theories of guilt.").  Indeed, courts have "long recognized that
an indictment may charge numerous offenses or the commission of
any one offense in several ways." United States v. Miller, 470
U.S. 130, 136 (1985); see, e.g., United States v. Celestin, 612
F.3d 14, 24 (1st Cir. 2010) (holding that "the district court
properly instructed the jury as to all the ways in which Celestin
could be convicted of the substantive bank fraud charges, which
were clearly set forth in the indictment"); United States v. Vilar,
729 F.3d 62, 81 (2d Cir. 2013) ("Even if it were true that Count
Four of the indictment originally contemplated both the GFRDA and
SBIC schemes, rather than the latter scheme alone, where a
generally framed indictment encompasses a specific legal theory or
evidence used at trial, there is no constructive amendment.").
Should the United States fail to present sufficient evidence to
sustain a jury finding that Diaz attempted to extort **property**,
Díaz may move for a judgment of acquittal at trial.

### 3. Factual Argument

Díaz sets forth a litany of factual arguments in his
quest to invalidate the indictment.  (Docket No. 103.)  For
example, he claims that the threat to "fuck this administration"

was merely an attempt to protect Person 1's father from additional attacks from "Fortaleza." Id. at p. 44.  It was not, Díaz argues, extortion.  Id.  Governor Rosselló purportedly instructed Díaz to meet with Person 1 simply to "evaluate what media control damage he could do with respect to the first chats released by [Person 1] that were already damaging to the reputation of the governor's cabinet." Id. at p. 40.

A motion to dismiss the indictment is not a trial. United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011) ("[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficient of the evidence behind an indictment's allegations."); United States v. Rodríguez-Colón, 979 F. Supp. 203, 204 (D.P.R. 2013) (Because a sufficiency of the evidence argument raises factual questions embraced in the "general issue," it is improper for a defendant to base his pretrial motion to dismiss the indictment on that argument.") (citation omitted) (Besosa, J.).  The jury will weigh the evidence, determine the credibility of witnesses, and resolve factual disputes. Consequently, Díaz's interpretations of the evidence are not legally sufficient reasons to dismiss the indictment.

### 4. The First Amendment Argument

Díaz asserts that he "enjoys robust First Amendment protection." (Docket No. 103 at p. 40.)  The freedom of speech is not, however, *carte blanche* to commit extortion.  Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 433 (2014) ("[I]t has never been an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); see United States v Sayer, 748 F.3d 425, 434 (1st Cir. 2014) ("To the extent his course of conduct targeting Jane Doe involved speech at all, his speech is not protected."); United States v. Bly, 510 F.3d 453, 458 (4th Cir. 2007) ("Threats – including threats of extortion – are not constitutionally protected simply because they are verbalized or written") (citation omitted); United States v. Boyd, 231 Fed. Appx. 314, 316 (5th Cir. May 4, 2007) ("The First Amendment does not protect extortion").  Accordingly, the protections enshrined by the First Amendment are no reason to dismiss the indictment.

### 5. The Wrongfulness Argument

Count two of the indictment avers that Díaz committed interstate extortion pursuant to 18 U.S.C. section 875(d) ("section 875(d)"). (Docket No. 1 at p. 6.)  This statute provides that:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d). To secure a conviction for interstate extortion, the United States must prove that Díaz "intended to transmit the interstate communication and that the communication contained a true threat." United States v. Nishnianidze, 342 F.3d 6, 14-15 (1st Cir. 2003) (citation omitted). A true threat is "one that a reasonable recipient familiar with the context of the communication would find threatening." Id.

According to Díaz, "the indictment in this case is insufficient because . . . it does not satisfy section 875(d)'s 'wrongfulness' element." (Docket No. 103 at p. 42.) He relies extensively on United States v. Jackson, 180 F.3d 55 (2d Cir. 1999), a case in which the Second Circuit Court of Appeals distinguished lawful acts to disseminate information from "wrongful" threats to extort. 180 F.3d at 67. For example, a "private club may threaten to post a list of club members who have not yet paid their dues" without running afoul of section 875(d). Id. The Jackson court held that "the phrase 'intent to extort' [in section 875(d)] was meant to reach only demands that are wrongful." Id. at 68. A threat is "wrongful" when the "threatener

does not have, and cannot reasonably believe she has, a claim or right, or where the threat has no nexus to a plausible claim of right." Id. at 71.

The parties do not cite, and the Court is not aware of, a relevant decision from the First Circuit Court of Appeals. See United States v. Ghalashahi, 92 F. App'x 6, 13 (1st Cir. Mar. 16, 2004) (acknowledging that "a claim of right defense [in a section 875(d) prosecution] is an issue of first impression in this court," but declining to resolve the issue). Whether section 875(d) contains a "wrongfulness" component is immaterial to the motion to dismiss. Count two of the indictment tracks the language of section 875(d), alleging that Díaz:

> with the intent to extort money and a thing of value, did knowingly transmit in interstate and foreign commerce, any communication containing a threat to injure the property or reputation of the addressee and others, and aided and abetted such offense, that is, in or about the date mentioned above, [Díaz] did transmit certain threats to Person 4; to wit, that [Díaz] would facilitate the publishing of Telegram messages containing damaging information about Person 4 and others unless [Díaz] received $300,000 and other things of value.

(Docket No. 1 at p. 5.) This allegation is sufficient and complies with the pleading standard set forth in Federal Rule of Criminal Procedure 7. See United States v. Savarese, 868 F.3d 1, 6 (1st Cir. 2012) ("An indictment that tracks the language of the underlying state is usually sufficient to meet this standard,

provided that the excerpted statutory language sets out all elements of the offense without material uncertainty.").

Díaz misconstrues the applicable standard of review. He would have the indictment include statutory interpretations from sister jurisdictions. This proposition is patently wrong. <u>See</u> <u>United States v. Troy</u>, 618 F.3d 27, 35 (1st Cir. 2010) ("A judicial gloss, though helpful in interpreting a criminal statute, need not be included verbatim in the charging instrument."). The United States District Court for the District of Maine rejected an identical argument from a defendant charged with violating section 875(d). <u>See</u> <u>United States v. Curley</u>, Case No. 13-058, 2014 U.S. Dist. LEXIS 5686, at *13 (D. Me. Jan. 16, 2014) ("Even assuming – as the Court does – that the First Circuit would concur with [the <u>Jackson</u> court], it stretches the point to conclude that a grand jury must expressly include the Second Circuit's judicial interpretation of criminal statutes in First Circuit indictments on pain of dismissal."). Accordingly, the purported "wrongfulness" deficiency cannot sustain Díaz motion to dismiss.

   **6. Argument Without Citation to Precedent or Other Authority**

The motion to dismiss contains a myriad of arguments that fail to cite precedent. For instance, "[n]either [Díaz] nor Person 4] had possession of the $300,000.00." (Docket No. 1-3 at

p. 37.)   According to Díaz, lack of possession negates the
extortion counts because "[mere] conversations contemplating a
crime cannot form the basis to convict for aiding and abetting nor
[*sic*] an attempt."   Id.   Which jurisdiction has held that an
element of attempted extortion is physical possession of the
property?   The Court will not dismiss the indictment based on
conclusory legal propositions.   See United States v. Zannino, 895
F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a
possible argument in the most skeletal way, leaving to the court
to do counsel's work, create the ossature for the argument, and
put flesh on its bones.").

### 7. Prosecutorial Misconduct

Díaz sets forth specious and unfounded allegations of
prosecutorial misconduct.   (Docket No. 103 at pp. 59-61.)   The
United States allegedly engaged in misconduct:

> Because after corroborating through Díaz-Colón [*sic*]
> recorded call with [Person 1], where he clearly
> indicated in the call that he never requested or wanted
> money from [Person 4] and he only wanted to revenge [*sic*]
> his dad for what they did to him, the Government should
> have refrained from filing this case against him.

Id. at p. 59. Allegations of prosecutorial misconduct are serious.
A lack of integrity erodes the public's trust in the criminal
justice system.   See United States v. Pirovolos, 844 F.2d 415, 425
(7th Cir. 1988) (noting that prosecutorial misconduct has the

potential to "[poison] the entire atmosphere of the trial."). Grave instances of prosecutorial misconduct require dismissal after conviction. Indeed, the United States is held to a high standard: "At its core, the job of a prosecutor is to do justice." United States v. Foster, 945 F.3d 470, 472 (6th Cir. 2016) (citation and quotation omitted). Not a scintilla of evidence suggests that the United States has deviated from this standard. Díaz accuses the prosecutors of misconduct simply because he disagrees with the evidence. Without citing the record, he alleges that the "purposeful distortion of material facts warrants dismissal of the indictment." (Docket No. 103 at p. 60.) Essentially, he is charging the United States with lying to the grand jury to obtain a true bill. The consequences of committing or suborning perjury are grave, including the loss of employment and even criminal prosecution. The Court will not tolerate unfounded accusations of misconduct, and admonishes counsel to refrain from making unsubstantiated claims of wrongdoing.

**III. Díaz's Motion to "Correct" an Inaccurate Transcript**

On July 16, 2019, Díaz and a confidential human source ("CHS") met to discuss, *inter alia*, a $300,000 payment. (Docket No. 78, Ex. 1.) The CHS surreptitiously recorded this conversation, conducted exclusively in Spanish. Id. The United States produced

a transcript of this conversation with an English translation.

<u>Id.</u>  The transcript contains the following exert:

| Spanish Recording | English Translation |
|---|---|
| **Díaz:** [OV] Sí, sí, sí.  Si é; accepta los $300,000 como me dijo.  Yo te aseguro a ti que él va a decir . . . la va a parar porque él me lo dijo. | **Díaz:**  Yes, yes, yes.   If he accepts those $300,000 like he said to me.   I can assure you that he will say . . . He will stop it because he said that to me. |
| **CHS:**  [Suspiro] Entonces si consigo lo ultimo tú garantizas que añadimos a Kobbo a las voces.  Esto, porque a lo major Kobbo puede ser otra línea, verdad, pa' que no . . . pa' que se vea – | **CHS:**  [Sigh] So if I can get the last part to you, you can ensure that we will include Kobbo as part of the voices.   Um, because maybe Kobbo can do another line, right, so that it won't . . . So that it will look |
| **Díaz:**  [OV] Tamién puede ser a él, 250 pa' coger 50 pa' Kobbo y no tienes que consequir 350. | **Díaz:**  [OV] It could also be 250 for him, in order to take 50 for Kobbo and you don't have to get 350. |
| **CHS:** Mmm y ahí tú garantizas las dos cosas. | **CHS:**  Mmm and that way you can guarantee both things |
| **Díaz:** Exactamente. | **Díaz:** Exactly. |
| **CHS:** Y lo otro yo te ayudo con eso de OGP y Hacienda, esto, *okay*.  Y si yo te qyudo con eso pues en la medida que tú puedas pues no ayudas también en – | **CHS:** And the other thing, I will help you with the OGP [Puerto Rico Office of Management and Budget] and the Hacienda [Puerto Rico Treasury] thing, um, okay.  And if I help you with that, then you can help us too whichever way you can — |

| **Díaz:** | [OV] Sí, papi, porque yo boy a . . . es que me tengo que meter en eso, papi. No hay *break*. De verdad, te lo juro. No hay *break*. No hay manera, vuelvo y te repito. | **Díaz:** | [OV] Yes, bro, because I am going to . . . The thing is that I have to get involved in this, bro. No break. Honestly, I swear. No break. There is just no way, like I said before. |
|---|---|---|---|

Id. at p. 2.   According to Díaz, the word "exactamente" is inaudible.   (Docket No. 78 at p. 1.)   The United States argues, however, that this word is audible with the aid of "audio enhancing software."   (Docket No. 90 at p. 2.)   It produced the recorded conversation for an *in camera* review.   (Docket No. 80.)   The Court determined that "something was said, but could not decipher the specific word or sound."   (Docket No. 83.)   Consequently, the Court held that "it will be for the jury to decide if what was said is the word 'exactamente,' translated as exactly."   Id.   (internal quotation marks omitted).

Díaz requests that the Court strike "exactamente" from the transcript, citing United States v. Carbone, 798 F.2d 21 (1st Cir. 1986).   This precedent merely held that "where a tape recording is challenged on the grounds of audibility [, ] the question is whether the inaudible parts are so substantial as to make the rest more misleading than helpful."   789 F.2d at 24.   The Carbone court "played all the tapes and [found] that none of them were so inaudible or unintelligible as to make them more misleading than

helpful." Id. at 25; see United States v. Panzardi-Lespier, 918 F.2d 313, 318 (1st Cir. 1990) ("The fact that portions of the tapes are unintelligible is not necessarily an impediment to the admission of the tapes."). Díaz seeks the removal of a single word. He does not, however, contend that the recorded conversation is tainted by the inability to decipher an isolated phrase or sound.

This Court possesses "broad discretion in ruling on the admissibility of tape recordings." Panzardi-Lespier, 918 F.2d at 318. In the event of a contested word, each party is "allowed to introduce its own transcript of the recording provided that it is properly authenticated." United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986); see United States v. Pion, 25 F.3d 18, 21 (1st Cir. 1994) ("After Pion objected to the alleged inaccuracies in the authenticated government transcript, he consented to its admission subject to the right to introduce his own transcript."); United States v. Figueroa, 976 F.2d 1446, 1457 (1st Cir. 1992) ("The court ordered that the defendants . . . either stipulate to the accuracy of the government's Spanish and English language translations or the tape recordings made during the DEA investigation, or provide their own translations."); United States v. Carson, 464 F.2d 424, 436 (2d Cir. 1972) ("The parties agreed that the transcripts accurately reflected the words on the tapes,

with certain exceptions as to which it was agreed that the transcripts would contain the version believed accurate by each party.").  Accordingly, the Court will instruct the jury that "there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept."  <u>Rengifo</u>, 789 F.2d at 983.  This is precisely what the Court held in the order issued on December 14, 2021. (Docket No. 83.)

Essentially, Díaz requests that the Court usurp the fact-finding function of the jury.  The jury, not the Court, will determine if Díaz said "exactamente."  At trial, the United States intends to "present FBI witness testimony as to the process and procedures undertaken to enhance the audio quality of the recordings." (Docket No. 81 at pp. 1–2.)  It purports that Díaz can be heard saying "exactamente" with the assistance of Acacia, a "playback system created and used by the United States to do audio verbatim translations."  <u>Id.</u> at p. 3.  Díaz may, in turn, proffer evidence contradicting this assertion and/or cross-exam the prospective FBI witness.  Accordingly, Díaz's motion to "correct" an inaccurate transcript is **DENIED**.

## IV.   Conclusion

For the reasons set forth above, Díaz's motion to dismiss the indictment is **DENIED**.  (Docket No. 103.)  His motion to "correct" an inaccurate transcript is also **DENIED**.  (Docket No. 87.)


**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 16, 2022.

                          s/ Francisco A. Besosa
                          FRANCISCO A. BESOSA
                          SENIOR UNITED STATES DISTRICT JUDGE