IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

        **v.**             **Criminal No.** 21-017 (FAB)

SIXTO JORGE DÍAZ-COLÓN,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court is defendant Sixto Jorge Díaz-Colón ("Díaz")'s motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 384.) Díaz also moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"). Id. For the reasons set forth below, Díaz's motions are both **DENIED**.

**I.   Introduction[1]**

    On July 4, 2019, media outlets released a trove of disparaging and profanity-laced Telegram messages involving former Puerto Rico Governor Ricardo A. Rosselló ("Rosselló") and his associates.

---

[1] The Court recites the facts in the light most favorable to the verdict. See United States v. Padilla-Galarza, 990 F.3d 60, 70 (1st Cir. 2021) (observing that "when reviewing a motion for judgment of acquittal, all facts must be taken in the light most favorable to the government.") (citation omitted).

(Docket No. 1 at p. 3.)[2] The content of these messages galvanized mass protests and a political maelstrom.  Rosselló announced his resignation on July 24, 2019, calling for "citizen reconciliation."  Patricia Mazzei, *et al.*, "Ricardo Rosselló, Puerto Rico's Governor, Resigns After Protests," New York Times (Jan. 24, 2019) (available at https://www.nytimes.com/2019/07/24/us/rossello-puerto-rico-govenor-resigns.html) (last visited June 16, 2022).  Díaz learned of the Telegram messages before they became public, providing leverage against the Rosselló administration.

Anthony Maceira served as the Executive Director of the Puerto Rico Ports Authority and the Secretary of Public Affairs.  (Docket No. 316 at pp. 66-67.)  He testified during the United States' case-in-chief, informing the jury that Díaz demanded, *inter alia*, $300,000.00 to prevent the publication of the Telegram messages. The extortionate demands to Maceira transpired in June and July 2019, at meetings where Díaz presented the problem (*i.e.* the son of a disgruntled government official in possession of incendiary messages), and its solution (*i.e.* hush money, renewal of government contracts, and funds to purchase favorable media coverage).

---

[2] Telegram is a "cloud-based instant messaging and voice-over-Internet Protocol (VoIP) service that allows its users to send messages, exchange photographs, videos, documents, and other files through the Internet."  (Docket No. 1 at p. 2.)

As the "face and the voice of the Government," Maceira interacted with "media people, reporters, [and] analysts . . . to coordinate interviews." Id. at pp. 72 and 79. Díaz produced a "political analysis program" on FM radio. Id. at p. 91. This program featured Maceira as a guest panelist on "multiple occasions." Id. at p. 93. Díaz sent Maceira a "secret" Telegram communication on June 20, 2019, however, deviating from their otherwise "friendly" and "courteous" relationship. Id. a pp. 93-97.[3]

**A. The June 20, 2019 Telegram Message**

On June 20, 2019, Maceira reported to the governor's residence and executive office, known as La Fortaleza. Id. at p. 96. He received the following Telegram message from Díaz:

> Man, if Fortaleza doesn't stop fucking with Raúl Maldonado, RAÚL MALDONADO'S SON HAS STRONG EVIDENCE TO FUCK THIS ADMINISTRATION STARTING WITH RICARDO ROSSELLÓ. According to Raulie 'son of RM,' you and Fortaleza are the ones who are behind this firepower against Raúl Maldonado. I tell you brother, RAÚL'S SON IS GOING TO DESTROY YOU ALL AT OTHER LEVELS. I don't know what you are going to do. But if they don't stop THE POPULARES ARE GOING TO BE IN POWER FOR 30 YEARS. STOP THIS. This is crazy. I have a friend who is a close friend of RM's son, and they want to see me to deliver hard evidence to me and other media. This administration is fucked. I need to stop this.

---

[3] A "secret chat" on Telegram "notifies [the sender] if the other user takes a screen shot or a picture of the screen." Id. at p. 94. Messages sent with a self-destruct timer disappear automatically from a group chat. Id.

Id. at p. 99; see Trial Ex. 7-T.  Maceira perceived this overture
as a threat, saving the message to the "notes" application on his
cellular phone to circumvent the "self-destruct timer" on
Telegram.  Id. at p. 98.

Governor Rosselló had appointed Raúl Maldonado-Gautier
("Maldonado-Gautier") to serve as the Secretary of Treasury.  Id.
at p. 101.  Hours before Maceira received Díaz's secret message,
the Puerto Rico press reported that the FBI commenced an
investigation into alleged misconduct at the Treasury Department.
Id.

Maceira had no knowledge of the "evidence" Díaz referred to
in the secret message, or of how this material might destroy the
Rosselló administration.  Id. at p. 105.  He informed the governor
and his chief of staff of the threat.  Id. at p. 106.  Díaz and
Maceira agreed to meet the next day at Musa, a restaurant in
Santurce, Puerto Rico.  Id. at p. 107.

**B. The June 21, 2019 Meeting**

When Maceira referred to the threat from the previous day,
Díaz stated "[w]ell, what I am seeing is going to destroy you."
Id. at p. 114.  Díaz explained that Maldonado-Gautier's son, Raúl
Maldonado-Nieves ("Maldonado-Nieves," or "Raulie"), "was right
next to [him] when he was texting [Maceira]" and was "pissed at
what was happening with his father."  Id. at p. 118.  Subsequently,

Díaz apologized for the threat.  Id. at p. 115.  Maceira dismissed this apology, however, describing the interaction as a "gangster style" ultimatum: "[If] you don't do X," then "I [will] do Y. Don't make me do that."  Id. at p. 116.

Díaz revealed that Maldonado-Nieves possessed a "binder full of devastating information," including conversations between Governor Rosselló and members of his cabinet.  Id. at p. 118. For example, the chats referred to the president of the Senate as an "asshole," cited evidence demonstrating that Attorney General Wanda Vázquez-Garced failed to investigate an advisor in the Rosselló administration, and that "one of the guards [at Fortaleza] [. . .] supposedly [had] evidence that [this adviser's] husband would bring marijuana to Ricardo [Rosselló] at the governor's mansion."  Id.; Docket No. 319 at p. 53.  Díaz also stated that Maldonado-Nieves "was looking into some information regarding [Maceira] and the Ports Authority."  (Docket No. 316 at p. 119.)

According to Díaz, Maldonado-Nieves "asked for $300,000 in exchange for the binder not being released."  Id. at p. 121. In addition to this demand, Díaz suggested that the Rosselló administration allocate funds to advertise government initiatives during a news segment produced by Díaz.  Id.  He also requested that Maceira assist him "in renewing two specific contracts that he had with the Government for social innovation."  Id. at p. 123.

Maceira testified that Díaz was "flexing," namedropping "influential people" in the media whom "he controlled." Id. at pp. 126-27.

Díaz and Maceira ended the meeting, but agreed to "keep in communication." Id. at p. 128.  According to Maceira, Díaz "doubled down on the threat, [. . .] he had flexed his power to show me how serious the threat was, and that he was extorting me for money in exchange for that threat not to become a reality." Id.  Maceira recorded the conversation during the June 21 meeting on his cellular phone.  See Trial Ex. 3-T.  The United States presented an audio tape of this recording and a corresponding English translation at trial.  Id.

Following the meeting at Musa, Maceira briefed Governor Rosselló.  Id. at p. 131.  The governor urged Maceira to "go to the authorities," and to confer with Héctor Pesquera ("Pesquera"), a retired FBI agent and the former Puerto Rico Secretary of Public Safety.  Id. at p. 132.  Four days later, Maceira met with Pesquera in Fort Lauderdale, Florida.  Id.  Pesquera referred Maceira to the FBI San Juan Field Office.  Id. at p. 34.

**C. Publication of the Telegram Chats**

Maldonado-Gautier appeared on Díaz's radio program on June 24, 2019, alluding to the Rosselló administration Treasury Department as an "institutional mafia." Id. at p. 153.  That same

day, Governor Rosselló removed Maldonado-Gautier from office.  Id. at p. 133.  Maldonado-Nieves publicly criticized Governor Rosselló for his father's termination.  Id. at p. 136.

Francisco Parés ("Parés") replaced Maldonado-Gautier as the Secretary of Treasury.  Id. at p. 138.  The Puerto Rico legislature voted to confirm Parés on July 8, 2019.  Id. at p. 139.  During this confirmation proceeding, the first excerpt of the Telegram chats appeared in the public domain.  Id. These chats "caused grave concern" for Maceira.  Id. at p. 142.  On the following day, the press released a second set of chats.  Id. at pp. 144-45.  On July 13, 2019, "889 pages of the Telegram chats were released."  Id. at p. 149.  This publication resulted in "total chaos" on the island.  Id. at p. 150.

The next day, July 14, 2019, Díaz sent Maceira "another secret message . . . to see if he had a way to help."  Id. at p. 155.  Maceira met with FBI agents on July 15, 2019 to discuss the prospect of "becoming a witness."  Id. at p. 157.

**D. The July 16, 2019 Meeting**

On July 16, 2019, Díaz and Maceira met at Il Postino, a restaurant in Miramar, Puerto Rico.  Id. at p. 165.  Just hours before this meeting, Díaz texted Maceira the following:

> I will always remember that [during the June 21 meeting]
> I warned you not to fire [Maldonado-Gautier] because we
> were going to get hit by a wave of shit.  In that moment,
> all this had not happened.  Now if they see me with you,
> they will say that I am indeed working for you.  Listen
> to me.  I have not lived 80 years by sitting on my hands.

Id. at pp. 166-67.  The FBI provided Maceira with three devices to record his conversation with Díaz at Il Postino.  Id. at p. 170. The jury listened to an enhanced audio recording of this conversation, and reviewed transcripts of the corresponding English translation.  Id. at p. 12.

Díaz explained that Maldonado-Nieves obtained the Telegram chats from his father's phone.  (Docket No. 319 at p. 24.)  He also stated that the public presumed that Maldonado-Gautier "had leaked the 889-page chat," but "it was actually Raulie."  Id.

Díaz reiterated that had Maceira "listened to him, the [Rosselló administration] wouldn't be" in political turmoil. (Docket No. 316 at p. 175.)  The release of the Telegram chats lit a "fire" in Puerto Rico.  Id. a p. 184.  During this second meeting, "the arsonist [,Díaz, offered] to be the firefighter."  Id.

## 1. Díaz's Demand for $300,000

The 889-page chat had been leaked and was already public. But Díaz informed Maceira that Maldonado-Nieves possessed "[a]dditional chats that could be scandals."  (Docket No. 319 at p. 44.)  These chats were "not in the 889 pages" previously

released to the public.  Id. at p. 49.  Maldonado-Nieves withheld the additional chats to "make everyone shit their pants," implementing a "strategy to keep the [Rosselló administration] scared." Id. at p. 50.

Maceira asked Díaz directly, "[how] the hell can we guarantee that [the additional chats don't] come out?"  (Docket No. 319 at p. 54.)  Díaz answered unambiguously: Maldonado-Nieves "want[ed] 300,000 cash or check," payable to a corporation owned by "someone of trust." Id. at pp. 58 and 86-87.  This payment would "guarantee to [Maceira] that [Maldonado-Nieves would] stop being a pain in the ass." Id. at p. 92.

## 2. The Renewal of Two Government Contracts

Díaz also informed Maceira that "he needed assistance with getting [two contracts] renewed." Id. at p. 68.  The "Collective Impact" and "Social Consulting" corporations had hired Díaz as a consultant for a "monthly retainer of $4,000." Id. at pp. 70, 107, and 121.  These corporations entered into service agreements with the Puerto Rico government.  (Docket No. 328 at p. 62.) Secretary of Treasury Parés suspended these contracts, however, requiring Díaz and his associates to "present a report explaining why the hell that . . . shit was needed."  (Docket No. 319 at p. 69.)  Díaz also demanded that Maceira "use [his] position as Secretary of Public Affairs to intervene with the Secretary of

Treasury to ensure that [Parés] would pay [pending] invoices" related to the two contracts.  (Docket No. 316 at p. 170.)  In exchange for Maceira's assistance, Díaz pledged to "raise [his] public image."  (Docket No. 319 at p. 107.)

### 3. Payment for Positive Media Coverage

Díaz proposed the production of a "movie."  Id. at p. 180.  This "película" required "certain media personalities" to "stop asking for the governor's resignation."  Id. at p. 180.  In exchange for positive media coverage, Maceira "would have to provide payments for [talent]" to appear in this production.  Id.

Díaz purportedly controlled several "influencers," including Mayra López-Mulero, Gary Rodríguez, Jorge de Castro Font, Molusco (real name Jorge Pabón), Red Shadow, Rocky the Kid (real name Roque José-Gallart), and Kobbo Santarrosa, who produces the highly rated TV show "La Comay."  (Docket No. 319 at pp. 80-81.)  Díaz offered favorable commentary from television personality Kobbo Santarrosa for $50,000 in addition to the $300,000 for Maldonado-Nieves.  (Docket No. 316 at p. 181.)  Rocky the Kid warranted less money, requiring just $6,000 to stop "asking for [the governor's] resignation." (Docket No. 319 at p. 97.)

Díaz volunteered to negotiate with Maldonado-Nieves on Maceira's behalf. Id. at p. 120.  If Maceira provided Díaz with $300,000, Díaz "could turn around to [Maldonado-Nieves] and say,

Raulie, there is not 300, there's only 250, and then use the other 50, the difference, for Kobbo Santarrosa . . . that way [Maceira] wouldn't have to get $350,000, only 300." Id. at. p. 120.

FBI agents retrieved the recording devices from Maceira immediately after the meeting.  Id. at p. 123.  On July 24, 2019, Governor Rosselló resigned from office.  Id. at p. 125.

### C. Díaz Deleted Telegram Messages During the Execution of a Warrant to Seize and Search his Cellular Phone

On July 26, 2019, Maceira received a "banner" notification on his cellular phone. (Docket No. 319. at p. 131.)  This Telegram alert informed Maceira that he received a message from Díaz, but did not display the contents of this communication.  Id. at p. 127.

FBI agents subsequently executed a warrant to seize and search Díaz's cellular phone.  (Docket No. 328 at p. 147.) Supervisory Special Agent Juan Carlos López-Velázquez ("López") located and interviewed Díaz at his residence.  Id. at p. 146. During this interview, Díaz's "phone was in his hand . . . he would pick up the phone during the interview and manipulate it."  Id. During that time, Díaz also participated in a recorded conversation with Maldonado-Nieves.  Id.

Maceira attempted to view Díaz's messages during the evening of July 26, 2019, after FBI agents executed the search and

seizure warrant.  (Docket No. 319 at p. 132.)  These messages had
been, however, erased from the secret chat.  Id.  Maceira then
notified the FBI.  Id. at p. 133.

     A grand jury returned a three-count indictment on
January 26, 2021, charging Díaz with attempted extortion in
violation of 18 U.S.C. sections 1951 and 2 (count one), interstate
extortion in violation of 18 U.S.C. sections 875(d) and 2 (count
two), and destruction of records in a federal investigation in
violation of 18 U.S.C. section 1519 (count three).  (Docket No.
1.)  On February 3, 2023, the jury found Díaz guilty on every count
of the indictment.  (Docket No. 365.)  Díaz moved for judgment of
acquittal and a new trial on February 17, 2023.  (Docket No. 384.)
The United States responded.  (Docket No. 393.)  Díaz replied.
(Docket No. 402.)

## II.   Díaz's Motion for Judgment of Acquittal

     This Court may set aside a jury's guilty verdict and enter
a judgment of acquittal of any offense for which the evidence is
insufficient to sustain a conviction.  See Fed. R. Crim. P. 29.
In reviewing a motion for judgment of acquittal, courts consider
the evidence "in the light most favorable to the prosecution" and
determine whether the "body of proof, as a whole, has sufficient
bite to ground a reasoned conclusion that the government proved
each of the elements of the charged crime beyond a reasonable

doubt." <u>United States v. Lara</u>, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).

Rule 29 motions require the Court to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." <u>United States v. Valerio</u>, 676 F.3d 237, 244 (1st Cir. 2012). The First Circuit Court of Appeals has called this sufficiency of evidence challenge "a tough sell," <u>United States v. Polanco</u>, 634 F.3d 39, 45 (1st Cir. 2011), observing that defendants seeking acquittal on this basis "face an uphill battle." <u>United States v. Pérez-Meléndez</u>, 599 F.3d 31, 40 (1st Cir. 2010); <u>accord United States v. Hatch</u>, 434 F.3d 1, 4 (1st Cir. 2006) (referring to the sufficiency of evidence burden as a "daunting hurdle[]") (internal quotation marks omitted).

While the sufficiency of the evidence is at the heart of the Rule 29 inquiry, deference to the jury's verdict controls the Court's analysis. To uphold the jury's guilty verdict, the Court need only determine that the conviction "finds support in a plausible rendition of the record." <u>See, e.g.</u>, <u>United States v. Shaw</u>, 670 F.3d 360, 362 (1st Cir. 2012). Ultimately, Díaz must establish that "the evidence is so scant that a rational factfinder could not conclude that the government proved **all** the essential elements of the charged crime beyond a reasonable doubt." <u>United</u>

States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019) (emphasis in original).

### A. Count One

Count one alleges that Díaz violated the Hobbs Act. (Docket No. 1.)   This statute provides that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).   Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   18 U.S.C. § 1951(b)(2).

### 1. Insufficiency of the Evidence Argument

Díaz asserts that "there is no evidence" that he "inflicted fear of economic loss into [*sic*] CHS Maceira."   (Docket No. 382 at p. 2.)   Fear of economic loss falls within the ambit of Hobbs Act extortion.   See United States v. Cruzado-Laureano, 404 F.3d 470, 481 (1st Cir. 2005) ("Extortion by 'fear' can mean fear of economic loss, including the possibility of lost business opportunities.") (citing United States v. Bucci, 839 F.2d 825, 828 (1st Cir. 1998) (holding that the United States must "show that the

victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances . . . rendered that fear reasonable.")); see, e.g., United States v. DiDonna, 866 F.3d 40, 46 (1st Cir. 2017) (affirming a Hobbs Act conviction in part because the "defendant told Buck directly that he had 'information in detail that if exposed would be disastrous for Buck's business.'")

Maceira testified that he felt "scared," and "frightened" after receiving Díaz's secret message on June 20, 2019. (Docket No. 316 at p. 106.) He "was concerned" for his "reputation, the effect it could have on [him], [his] family, on [his] employment, on [his] employment status after [he] decided to go back to private practice." Id. at p. 112. This testimony is sufficient to satisfy the fear element in count one.

Díaz also contends that the record "lacks any evidence that [he] went beyond one mere conversation with CHS Maceira expressing him [sic] an alleged message that Rauli Maldonado had said that he did not want the Chats to be released he was demanding $300,000 in exchange." (Docket No. 384 at p. 42.) This statement is an incomplete rendition of the evidence presented at trial. Díaz sent Maceira a secret message on June 20, 2019, and met with Maceira on June 21, 2019 and July 16, 2019. The June 20

message and statements that Díaz made at Musa and Il Postino constitute powerful evidence of Hobbs Act extortion.

### 2. Transferable Property

Díaz suggests that "Court I [*sic*] of the indictment should be set aside" because Maceira testified that the "Social Consulting and Collective Impact contracts were not transferable." (Docket No. 382 at p. 44.)  In Skehar v. United States, the Supreme Court held that property subject to a Hobbs Act prosecution must "be transferable – that is, capable of passing from one person to another."  570 U.S. 729, 734 (2013).  The Court need not, however, determine whether the Social Consulting and Collective Impact contracts are properties for purposes of the Hobbs Act because Díaz repeatedly demanded that Maceira pay $300,000 to prevent the release of Telegram messages in addition to the 889 pages that had already been leaked and were public.  See Docket No. 316 at p. 120.  It is beyond peradventure that United States currency is transferable.  See United States v. Buffis, 867 F.3d 230, 234 (1st Cir. 2017) (affirming a Hobbs Act extortion conviction in part because the defendant "received a payment that he was not entitled to collect; the four-thousand dollar check, which he deposited into his own personal slush-fund.").  Accordingly, Díaz's property argument is unavailing.

### B. Count Two

Díaz contends that "there is no evidence supporting" a conviction for interstate extortion.  (Docket No. 384 at p. 45.) To obtain a conviction pursuant to 18 U.S.C. section 875(d) ("section 875(d)"), the United States had to establish:

> (1) that the defendant transmitted a communication in interstate commerce; (2) that the communication contained a threat to injure the reputation of another or to accuse another person of a crime; and (3) that the defendant transmitted the communication with the intent to extort something of value from another.

United States v. Cantwell, 64 F.4th 396 (2023).  A threat is a communication "that a reasonable recipient familiar with the context of the communication would find threatening."  United States v. Nishnianidze, 342 F.3d 6, 15 (1st Cir. 2003) (citation omitted).

Díaz maintains that "a careful reading of" his June 19, 2019 message to Maceira illustrates that this communication "does not carry within [*sic*] any threat whatsoever."  (Docket No. 384 at p. 45.)  Díaz's understanding of this message is irrelevant.  That evidence presented at trial may be subject to an interpretation that is inconsistent with a finding of guilt beyond a reasonable doubt is no reason to grant a Rule 29 motion.  See United States v. Peña-Santo, 809 F.3d 686, 698 (1st Cir. 2015) (noting that the United States need not succeed in "eliminating every possible

theory consistent with the defendant's innocence" to defeat a Rule
29 motion).

Díaz warned Maceira, "if Fortaleza doesn't stop fucking with
Raúl Maldonado, RAÚL MALDONADO'S SON HAS STRONG EVIDENCE TO FUCK
THIS ADMINSTRATION STARTING WITH RICARDO ROSSELLÓ."   (Docket No.
316 at p. 99; <u>see</u> Trial Ex. 7-T.)   According to Díaz, Maldonado-
Nieves understood that Maceira and "Fortaleza [were] the ones who
[were] behind this firepower against Raúl Maldonado. I tell you
brother, RAÚL'S SON IS GOING TO DESTROY YOU ALL AT OTHER LEVELS."
<u>Id.</u>  A reasonable person might find this message threatening.   In
fact, the First Circuit Court of Appeals recently affirmed a
section 875(d) conviction based on similar threats transmitted on
the Telegram application.   <u>United States v. Cantwell</u>, 64 F.4th
396.   The defendant in <u>Cantwell</u> cautioned the victim to "[get] a
fucking life or I will ruin the one you have," and that the victim
was "going to lose everything [he had]."   <u>Id.</u>   Construing the
evidence in the light most favorable to the verdict compels the
Court to conclude that it would be inappropriate to disturb the
jury's verdict as to count two.

### C. Count Three

Díaz's motion for judgment of acquittal is nearly identical
to the motion to dismiss filed on February 2, 2022. (Docket Nos.
103 and 382.)   Indeed, Díaz copied and pasted six paragraphs

directly from his previous pleading, a section pertaining to count three of the indictment. Id.  The Court refers Díaz to the Opinion and Order issued on June 16, 2022, particularly to the section of the opinion entitled "argument without citation to precedent or other authority."  See United States v. Díaz-Colón, 607 F. Supp. 3d 136, 147 (D.P.R. 2022) (Besosa, J.).

        To secure a conviction for count three, the United States had to prove that Díaz "knowingly [altered, destroyed, mutilated, concealed, covered up, falsified, or made] a false entry into any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States."  18 U.S.C. § 1519.

    Díaz argues that Special Agent López "never testified that he saw [him] erasing messages."  (Docket No. 384 at p. 50.)  Maceira and Special Agent López testified, however, that Díaz sent a secret message.  Before Maceira opened this message, the FBI interviewed Díaz at his home and executed the search and seizure warrant.  Díaz erased the secret message after the FBI intervention.  Resolving "all evidentiary disputes and credibility questions in favor of the government" and "drawing all reasonable inferences in favor of the government's case," United States v Cedeño-Mariano, 971 F. Supp. 2d 225, 230 (D.P.R. 2013) (Besosa, J.), the Court concludes

that ample evidence supports a section 1519 conviction. Consequently, Díaz's motion for judgment of acquittal is **DENIED**.

## III. Díaz's Motion for a New Trial

Díaz's motion for a new trial is premised predominantly on allegations of prosecutorial misconduct and subornation of perjury. A defendant may base his or her motion for a new trial on newly discovered evidence or on other grounds, but "[t]he remedy of a new trial must be used sparingly and only where a miscarriage of justice would otherwise result." Fed. R. Crim. P. 33(b); United States v. Del Valle, 566 F.3d 31, 38 (1st Cir. 2009) (internal citation and quotation marks omitted). A four prong test first articulated by the First Circuit Court of Appeals in United States v. Wright, 625 F.2d 1017 (1st Cir. 1980), remains the standard by which courts analyze newly discovered evidence in the context of a Rule 33 motion. United States v. Rodríguez-Marrero, 390 F.3d 1, 14 (1st Cir. 2004).[4] A motion for a new trial based on newly discovered evidence will ordinarily fail unless the movant demonstrates that:

---

[4] Perjury committed by witnesses during trial is considered newly discovered evidence for purposes of a Rule 33 motion. See United States v. Huddleston, 194 F.3d 214, 220 (1st Cir. 1999) ("In short, we fail to see any substantial justification for treating the discovery of perjury differently than other newly discovered evidence.").

> (1) the evidence was unknown or unavailable to the
> defendant at the time of trial; (2) failure to learn of
> the evidence was not due to lack of diligence by the
> defendant; (3) the evidence is material, and not merely
> cumulative or impeaching; and (4) it will probably
> result in an acquittal upon retrial of the defendant.

United States v. Pereira, 51 F. Supp.3d 203, 210 (D.P.R. 2014)

(Besosa, J.) (citing Wright, 625 F.2d at 1019).  The defendant

must satisfy all four prongs to prevail on a Rule 33 motion.

United States v. Colón-Muñoz, 318 F.3d 348, 360 (1st Cir. 2003).

Failure to satisfy just one Wright factor defeats a Rule 33 motion

*in toto*.  United States v. González-González, 258 F.3d 16, 20 (1st

Cir. 2001).

Wright and its progeny impose an onerous burden on convicted

defendants.  A new trial is justified only when introduction of

the additional evidence "will probably result in an acquittal,"

meaning "an actual probability that an acquittal would have

resulted if the evidence had been available."  United States v.

Sepúlveda, 15 F.3d 1216, 1220 (1st Cir. 1993).[5]  The Court examines
newly discovered evidence within the context of the "record as a
whole, not on the basis of wishful thinking, rank conjecture, or
unsupportable surmise."  Natanel, 938 F.2d at 314; Josleyn, 206
F.3d at 157 (Rule 33 analysis is based on "an evaluation of the
new evidence in juxtaposition to the evidence actually admitted at
trial.").  Newly discovered evidence that is merely impeaching
cannot form the basis for a new trial. Colón-Muñoz, 318 F.3d at
361.

## A. The Allegations of Prosecutorial Misconduct are Frivolous

Díaz sets forth claims of prosecutorial misconduct with
no knowledge of what, precisely, these accusations entail.  He
conflates prosecutorial misconduct with commonplace evidentiary
disputes and differences of opinion.  For example, Díaz posits
that the:

---

[5] Motions for a new trial are routinely denied and are hardly ever granted.
See, United States v. Connolly, 504 F.3d 206, 217 ("the jailhouse recantation,
even if it occurred, did not require the granting of a new trial"); Marrero,
390 F.3d at 30 ("Having presided at the lengthy trial of Genao and his co-
defendants, and having heard the testimony of the co-conspirators produced at
the hearing on the motion for a new trial, the district court did not remotely
abuse its discretion in rejecting the arguments that the testimony from Genao's
co-conspirators `will probably result in an acquittal upon retrial.'"); United
States v. Colón-Muñoz, 318 F.3d  at 360-61 ("Rule 33 motion fails the third
prong of the Wright standard" because witness's "revised sworn statement was an
attempt to impeach his own trial testimony"); United States v. Josleyn, 206
F.3d 144, 160 (affirming denial of Rule 33 motion because the "outcome would
undoubtedly be the same"); Huddleston, 194 F.3d at 221 (despite newly discovered
impeachment evidence, "the jury had ample evidence of the appellant's guilt");
United States v. Natanel, 938 F.2d 302, 314 (1st Cir. 1991) (upholding denial
of Rule 33 motion because "adding this evidence to the trial mix would not
"probably result in an acquittal upon retrial of the defendant'").

>      Government committed prosecutorial misconduct because
> after corroborating through CHS Maceira's June 21, 2019
> Musa restaurant recording between him and Díaz-Colón,
> the government knew that the recording did not contain
> any information as to CHS Maceira's testimony that Díaz-
> Colón attempted to extort him by demanding that he pay
> Rauli Maldonado the sum of $300,000 in exchange for not
> having him release the Chats that were going to destroy
> the governor and CHS Maceira's reputation.

(Docket No. 384 at p. 51.)  The Court cannot discern which allegation pertains to prosecutorial misconduct.  The United States and Díaz's interpretations of the evidence differ.  Díaz's conclusory inference regarding the absence of "any information as to CHS Maceira's testimony that [he] attempted to extort [Maceira]" is his opinion.  That the United Sates (and evidently the jury) disagree with this opinion is not prosecutorial misconduct.

Díaz additionally attempts to demonstrate prosecutorial misconduct by setting forth a litany of perjury allegations. (Docket No. 382 at pp. 51-70.)  Perjury is generally defined as the "act or an instance of a person's deliberately making material false or misleading statements while under oath."  Black's Law Dictionary 1321 (10th ed. 2014).  Díaz misconstrues this term.  He asserts that the United States suborned perjury based on inconsistent versions of fact provided by Maceira and Governor Rosselló, respectively. (Docket No. 384 at pp. 53-54.)  This argument is meritless.

Maceira testified at trial that he informed Governor Rosselló

of the threat contained in Díaz's secret message from June 20,
2019. (Docket No. 316 at p. 106.) Governor Rosselló informed the
FBI, however, that he had no knowledge of this threat. (Docket
No. 384 at p. 54.) According to Díaz, this discrepancy constitutes
evidence that the United States suborned Maceira's commission of
perjury. Id. It does not. Witness recollections vary, and
conflicting evidence is offered at nearly every trial. This is
precisely the reason why juries are empaneled to resolve factual
inconsistencies. Díaz's expansive interpretation of what
constitutes prosecutorial misconduct would impugn every Assistant
United States Attorney ("AUSA") handling a case involving more
than one witness.

Díaz accuses AUSA Myriam Fernández-González ("Fernández") of
prosecutorial misconduct because she sent an "e-mail stating that
the Recording [of the meeting a Musa] is inaudible." (Docket No.
384 at p. 56.) Special Agent López allegedly informed Díaz,
however, that this recording is audible. These statements are
incorrect. AUSA Fernández's e-mail merely states that "no
enhancement [of this recording] was made," confirming that Díaz
received this audio file in a previous discovery package. (Docket
No. 384, Ex. 1 at p. 181.) She does not represent to defense
counsel that the recording is inaudible. Accordingly, this
allegation of prosecutorial misconduct is frivolous and

unnecessarily impugns the integrity of an Assistant United States Attorney, something is unbecoming of an officer of the Court with nearly four decades of experience.

Lastly, Díaz maintains that the FBI engaged in "gross misconduct" on July 26, 2019. (Docket No. 384 at p. 69.)  He avers that the FBI agents failed to provide him with Miranda warnings, "never [informed] him [that] he was a target," and pressured him to call Maldonado-Nieves.  Id.

The FBI agents did not place Díaz in custody.  Accordingly, Special Agent López had no obligation to Mirandize Díaz.  See United States v. Molina-Gómez, 781 F.3d 13, 22 (1st Cir. 2015) ("Both 'custody' and 'interrogation' must be present to require Miranda warnings."); see, e.g., United States v. Infante, 701 F.3d 386, 398 (1st Cir. 2012) ("[B]ecause Infante was not in custody while he was questioned at the hospital, the officers were not required to give him Miranda warnings.")  Moreover, law enforcement officers have no duty to inform the target of a criminal investigation of this designation.  See United States v. Olivieri, 740 F. Supp. 2d 423, 424 (S.D.N.Y. 2010) ("The law places no generalized duty on the Government to inform individuals who are being investigated, interviewed, or deposed that they are a target or subject of a criminal investigation.") (citing United States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987)).  Finally, Díaz's

allegation that FBI agents "pressured" him to call Maldonado-Nieves is undeveloped.  What pressure did the agents exert?  Díaz does not specify, and the Court is not clairvoyant.  Consequently, the Court finds that there is no evidence of misconduct by the United States Attorney's Office or the FBI in this case.  Because Díaz sets forth no basis to disturb the jury's guilty verdict, the Rule 33 motion is **DENIED**.

## IV.  Conclusion

For the reasons set forth above, Díaz motions for a new trial and judgment of acquittal are **DENIED**.  (Docket No. 384.)

.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 9, 2023.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE