IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff**,<br><br>v.<br><br>SIXTO JORGE DÍAZ-COLÓN,<br><br>**Defendant**. | **Criminal No.** 21-017 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court is defendant Sixto Jorge Díaz-Colón ("Díaz")'s motion for bail pending appeal. (Docket No. 478.) For the reasons set forth below, Díaz's motion is **DENIED**.

I.  Introduction

A grand jury returned a three-count indictment on January 26, 2021, charging Díaz with attempted extortion in violation of 18 U.S.C. sections 1951 and 2 (count one), interstate extortion in violation of 18 U.S.C. sections 875(d) and 2 (count two), and destruction of records in a federal investigation in violation of 18 U.S.C. section 1519 (count three). (Docket No. 1.)  On February 3, 2023, the jury found Díaz guilty of every count of the indictment. (Docket No. 365.)  Immediately after return of the verdict, the Court remanded Díaz to the custody of the Bureau of Prisons. (Docket No. 364.)

Díaz subsequently received a 51-month term of imprisonment as to counts one and three, and a 24-month term of imprisonment as to count two, to be served concurrently with each other. (Docket No. 459.) On August 8, 2023, Díaz filed a notice of appeal. (Docket No. 463.) Seven months later, he then moved for bail pending appeal on March 18, 2024, citing six "issues that are expected to result in a reversal, a new trial, or acquittal on appeal." (Docket No. 478 at p. 22.) The United States responded, contending that Díaz "recycled" arguments repeatedly rejected by this Court. (Docket No. 480 at p. 6.)

**II.  Section 3143 of the Bail Reform Act**

"The provisions of 18 U.S.C. § 3143 govern release pending sentencing or appeal." Fed. R. Crim. P. 46(c). Congress enacted this provision to "reverse the presumption in favor of bail that had been established under the prior statute." United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985). Pursuant to section 3143, "it is presumed that an individual convicted of an offense and sentenced to a term of imprisonment . . . will be detained pending appeal." United States v. Vázquez-Botet, No. 04-160, 2007 U.S. Dist. LEXIS 7084, at *4 (D.P.R. Jan. 30, 2007) (Fusté, J.) (citing United States v. Colón-Muñoz, 292 F.3d 18, 20 (1st Cir. 2002)). To prevail, Díaz must establish by clear and convincing evidence that: (1) he is "not likely to flee or pose a danger to the safety

of any other person or the community if released," (2) that his "appeal is not for the purpose of delay," and (3) that the appeal "raises a substantial question of law or fact."  18 U.S.C. § 3143(b)(1); see United States v. Colón-Berríos, 791 F.2d 211, 214 n.4 (1st Cir. 1986) ("In enacting § 3143, Congress placed the burden as to *all* elements bearing on whether to grant bail pending appeal on defendants.").  The Court will focus only on whether Díaz's motion raises a substantial question of law or fact. That issue is dispositive here to decide whether or not to grant bail on appeal.  United States v. Ortiz-Carrasco, 863 F.3d 1, 4 (1st Cir. 2017)

Courts engage in a two-pronged analysis to determine whether an appeal presents a substantial question of law.  United States v. Zimny, 857 F.3d 97, 99 (1st Cir. 2017).  First, the appeal must present "a close question or one that very well could be decided the other way."  Id. at 100 (citing United States v. Bayko, 774 F.2d 516, 523 (1st Cir. 1985)); see Colón-Muñoz, 292 F.3d at 20 ("The 'likely to result' standard is applied flexibly – a question that can be regarded as 'close' will suffice.").  Second, courts consider the "likelihood prong," inquiring whether a favorable disposition will "result in reversal or an order for a new trial of all counts on which imprisonment has been imposed."  Id. Moreover, the purported error "must not be harmless or

Criminal No. 21-017 (FAB)                                                    4

unprejudicial." Bayko, 774 F.2d at 523; see, e.g., United States v. Gurry, Case No. 16-10343, 2020 U.S. Dist. LEXIS 38273, at *31 (D. Mass. Mar, 5, 2020) ("Even if the appellate court were to find that some witness testimony was admitted in error or were to agree with the Court that the Government's statements in its closing rebuttal were improper, it is unlikely that those decisions would result in an acquittal, new trial, or a reduced sentence given the weight of the evidence involved in this case.").

**III. Discussion**

As a preliminary matter, Díaz misconstrues the law.  He cites United States v. Provenzano, 605 F.2d 85, 87 (3rd Cir. 1979) for the proposition that "one convicted of a crime shall be entitled to bail while appealing his conviction, unless no set of conditions upon release will reasonably assure that he will not flee or pose a danger to the community."  (Docket No. 478 at p. 16.)  This citation quotes the Bail Reform Act of 1966 *verbatim*, a vestige from a displaced legal regime.  Pursuant to this statute, "convicted defendants were presumptively entitled to the same opportunity for release on bail as defendants who had not already been convicted." Colón-Berríos, 791 F.2d at 214 n.4.  That is no longer good law.

Congress subsequently enacted the Bail Reform Act of 1984, however, reversing the presumption in favor of bail pending appeal.

Criminal No. 21-017 (FAB)                                               5

Id. at 214 ("Congress intended § 1342(b) [of the current statute] to result in a presumption against release of convicted defendants pending appeal."); Colón-Muñoz, 292 F.3d at 20 ("Under the Bail Reform Act of 1984, there is no presumption in favor of release pending appeal; on the contrary, even when the conviction does not involve a crime of violence or drug offense, detention (following conviction and sentencing) is mandatory unless the judicial officer finds *inter alia* [that the appeal] raises a substantial question of law"); see United States v. Santos, 65 F. Supp. 2d 802, 807-08 (N.D. Ill. 1999) ("The Bail Reform Act of 1984, 18 U.S.C. § 3143(b), governs the issue of release pending appeal [and was] [e]nacted largely to reverse the presumption in favor of bail under the Bail Reform Act of 1966."). United States v. Ortiz-Carrasco, 863 F.3d 1, 4 (1st Cir. 2017) Díaz's reliance on an obsolete opinion issued in 1979 by the Third Circuit Court of Appeals only accentuates the deficiencies in his motion, particularly when authoritative precedent from the First Circuit itself sets forth the applicable legal standard.

Díaz argues that six substantial questions of law will likely result in a reversal, new trial, or acquittal on appeal.  (Docket No. 478 at p. 21.)  First, Díaz alleges that the Court erred in denying his Rule 29 motion because the United States failed to prove "every element of the offenses charged in the indictment."

Criminal No. 21-017 (FAB)                                                6

Id.  Second, Díaz claims that the United States engaged in misconduct before the grand jury and at trial.  Id.  Third, Díaz alleges that the Court erred in refusing to dismiss the indictment in the interests of justice.  Id. at pp. 21-22.  Fourth, Díaz argues that the Court prevented him from confronting his accusers in violation of the Sixth Amendment.  Id. at p. 22.  Fifth, the Court allegedly erred in denying Díaz's motion for a mistrial, allowing "a prejudicial variance between the evidence presented at trial and the charges of the indictment."  Id.  Finally, Díaz asserts that the Court "abused its discretion in imparting erroneous jury instructions."  Id.  As discussed below, Díaz's arguments do not constitute substantial questions of law, and do not merit granting bail on appeal.

    **A.   The Rule 29 Argument**

The Court denied Díaz's motion for judgment of acquittal in a comprehensive Opinion and Order.  See United States v. Díaz-Colón, Case No. 21-017, 2023 U.S. Dist. LEXIS 82031 (D.P.R. May 9, 2023) (Besosa, J.).  This disposition addressed the same arguments presented by Díaz on appeal.  For example, Díaz contended that the record "lacks any evidence that [he] went beyond one mere conversation with CHS [Anthony Maceira ("Maceira")]" in his Rule 29 motion.  (Docket No. 384 at p. 42.)  His appellate brief posits that "mere conversations, without more, do not suffice to

Criminal No. 21-017 (FAB)                                             7

establish said offense." Brief for Appellant at 44, United States v. Díaz-Colón (No. 23-1692). This Court held, however, that Díaz proffers an "incomplete rendition of the evidence presented at trial." Díaz-Colón, 2023 U.S. Dist. LEXIS 82031, at *16. Courts and jurors "consider the evidence as a whole," not in isolated incidents without context or the benefit of commonsense. United States v. Pina-Nieves, 59 F.4th 9, 15 (1st Cir. 2023).

Anthony Maceira served as the Executive Director of the Puerto Rico Ports Authority and the Secretary of Public Affairs during the administration of former Puerto Rico Governor Ricardo A. Rosselló ("Rosselló"). (Docket No. 316 at pp. 66-67.) He testified during the United States' case-in-chief, informing the jury that Díaz demanded, *inter alia*, $300,000.00 to prevent the publication of certain "chats" contained in Telegram messages between members of the Rosselló administration. Id. These messages included disparaging and profanity-laced conversations involving former Governor Rosselló and his associates. (Docket No. 1 at p. 3.)

On July 8, 2019, the first excerpt of the Telegram chats appeared in the public domain. (Docket No. 319 at p. 138.) On the following day, the press released a second set of chats. Id. at pp. 144-45. On July 13, 2019, the entire "889 pages of the Telegram chats [was] released." Id. at p. 149. This publication

Criminal No. 21-017 (FAB)                                              8

resulted in "total chaos" on the island, Id. at p. 150, but did not deter Díaz from demanding the $300,000.

The next day, July 14, 2019, Díaz sent Maceira "another secret message . . . to see if he had a way to help." Id. at p. 155. On July 16, 2019, Díaz and Maceira met at Il Postino, a restaurant in Miramar, Puerto Rico. Id. at p. 165. The 889-page chat had been leaked and was already public. But Díaz informed Maceira that Maldonado-Nieves possessed [and which Díaz himself had in his possession] "[a]dditional chats that could be scandals." (Docket No. 319 at p. 44.) These chats were "not in the 889 pages" previously released to the public. Id. at p. 49. Maldonado-Nieves withheld the additional chats to "make everyone shit their pants," implementing a "strategy to keep the [Rosselló administration] scared." Id. at p. 50. Maceira asked Díaz directly, "[how] the hell can we guarantee that [the additional chats don't] come out?" (Docket No. 319 at p. 54.) Díaz continued to demand "300,000 cash or check," payable to a corporation owned by "someone of trust." Id. at pp. 58 and 86-87. This evidence and additional testimony elicited at trial proved that Díaz committed extortion, a conclusion drawn by the jury after a ten-day trial.

Moreover, Díaz's Rule 29 motion and appellate brief argue that certain Collective Impact and Social Consulting "contracts

Criminal No. 21-017 (FAB)                                                  9

could not be transferred, thus negating any Hobbs Act criminal violation." (Brief for Appellant at 106; Docket No. 382 at p. 44.) Maceira testified at trial that "[Díaz] needed assistance with getting [two contracts] renewed." (Docket No. 319 at p. 68.) The "Collective Impact" and "Social Consulting" corporations had hired Díaz as a consultant for a "monthly retainer of $4,000." Id. at pp. 70, 107, and 121. These corporations entered into service agreements with the Puerto Rico government. (Docket No. 328 at p. 62.) Secretary of Treasury Francisco Parés suspended these contracts, however, requiring Díaz and his associates to "present a report explaining why the hell that . . . shit was needed." (Docket No. 319 at p. 69.) Díaz also demanded that Maceira "use [his] position as Secretary of Public Affairs to intervene with the Secretary of Treasury to ensure that [Parés] would pay [pending] invoices" related to the two contracts. (Docket No. 316 at p. 170.) In exchange for Maceira's assistance, Díaz pledged to "raise [his] public image." (Docket No. 319 at p. 107.)

According to Díaz, count one of the indictment "should be set aside" because Maceira testified that the "Social Consulting and Collective Impact contracts were not transferable." (Docket No. 382 at p. 44.) In Skehar v. United States, the Supreme Court held that property subject to a Hobbs Act prosecution must "be

Criminal No. 21-017 (FAB)                                                  10

transferable – that is, capable of passing from one person to another." 570 U.S. 729, 734 (2013). The Court need not, however, determine whether the Social Consulting and Collective Impact contracts are properties for purposes of the Hobbs Act because Díaz repeatedly demanded that Maceira pay $300,000 to prevent the release of Telegram messages in addition to the 889 pages that had already been leaked and were public. See Docket No. 316 at p. 120. It is beyond peradventure that United States currency is transferable. See United States v. Buffis, 867 F.3d 230, 234 (1st Cir. 2017) (affirming a Hobbs Act extortion conviction in part because the defendant "received a payment that he was not entitled to collect; the four-thousand dollar check, which he deposited into his own personal slush-fund."). Because Díaz's Rule 29 arguments fail to raise substantial questions of law, the presumption of detention pending appeal remains intact.

**B. Allegations of Government Misconduct**

On appeal, Díaz maintains that the United States failed to disclose an audible recording of the June 21, 2019 meeting between himself and Maceira at Musa, a restaurant in Santurce, Puerto Rico. Brief for Appellant at 103. This allegation is premised on the existence of an enhanced recording, an audio file with better sound quality than the evidence disclosed to Díaz in discovery, and adduced at trial. According to Díaz, the United

States sent an "e-mail stating that the Recording [of the meeting at Musa] is inaudible."  (Docket No. 384 at p. 56.)  Díaz again mischaracterizes this email.  The e-mail merely states that "no enhancement [of this recording] was made," not that the recording is inaudible.[1]  (Docket No. 384, Ex. 1 at p. 181.)  Accordingly, this allegation of prosecutorial misconduct is frivolous and has no basis in fact.

In any event, Díaz concedes in his appellate brief that the misconduct allegations are based on pure speculation.  He acknowledges that he is "not aware if [the government technician]" did, indeed, "[make] an enhancement of the Musa recording."  Id. As the Court has stated on multiple occasions, there is not a scintilla of evidence to suggest that the United States engaged in misconduct.  Díaz continues, however, to pursue this claim without compunction.

### C. The Alleged Sixth Amendment Violations

Díaz argues that the Court improperly restricted his right to cross-examine Federal Bureau of Investigation Special Agent Juan Carlos López-Velázquez and Anthony Maceira.  Brief for Appellant at pp. 112-122.  Defense counsel attempted to elicit statements from a recorded conversation between Díaz and Rául

---

[1] The jury was able to listen to the recording.

Criminal No. 21-017 (FAB)                                            12

Maldonado-Nieves.  Id. at 114.  The Court sustained the United States' hearsay objection.  Id.  Defense counsel also attempted to elicit testimony regarding irrelevant matters (*e.g.,* Puerto Rico law regarding recorded conversations).  Id.  The First Circuit Court of Appeals reviews "evidentiary rulings for abuse of discretion, affording the court considerable deference."  Núñez-Colón v. Toledo-Dávila, 648 F.3d 15, 21-22 (1st Cir. 2011) (citation omitted).  The Court did not abuse its discretion in restricting defense counsel from eliciting this inadmissible evidence.  Because Díaz's evidentiary challenges fail to present a substantial question of law, his motion for bail pending appeal cannot rest on an alleged Sixth Amendment violation.

**D. The Purported Variance**

A variance occurs when "the charging terms remain unchanged, [but] the facts proved at trial are different from those alleged in the indictment."  United States v. DeCicco, 439 F.3d 36, 43 (1st Cir. 1993).  This error requires reversal only if "it affects the defendant's substantial rights, *i.e.*, the right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and the right to prevent a second prosecution for the same offense."  United States v. Katana,

93 F.4th 521 (1st Cir. 2024).² Díaz asserts that "[it] is impossible to ascertain what evidence the jury relied on to convict [him], but they received variant evidence of crimes/facts that were not part of the indictment, that reasonably could have led to it." Brief for Appellant at 131.

The evidence relied on by the jury is readily ascertainable. The United States elicited testimony from Anthony Maceira and other witnesses demonstrating that Díaz demanded $300,000 to suppress the publication of Telegram chats, including those additional to those already leaked, which were damaging to the administration of then-Governor Ricardo Rosselló. No evidence proved more damaging than the following Telegram message from Díaz himself:

---

² Díaz conflates variance with the corollary concept of constructive amendment. Brief for Appellant at 123. He cites United States v. Dubón-Otero, 292 F.3d 1, 4 (1st Cir. 2002), for the proposition that a variance is "[an] amendment of the indictment [that] occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or the Court after the grand jury has returned the indictment." Id. This quotation sets forth the definition a "constructive amendment." Dubón-Otero, 292 F.3d at 4 ("A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has passed upon them."). The First Circuit Court of Appeals has noted that litigants are often "uncertain[]" in "identifying the dividing line between a constructive amendment and a prejudicial variance." Katana, 93 F.4th 521.

> Man, if Fortaleza doesn't stop fucking with Raúl Maldonado, RAÚL MALDONADO'S SON HAS STRONG EVIDENCE TO FUCK THIS ADMINISTRATION STARTING WITH RICARDO ROSSELLÓ. According to Raulie 'son of RM,' you and Fortaleza are the ones who are behind this firepower against Raúl Maldonado. I tell you brother, RAÚL'S SON IS GOING TO DESTROY YOU ALL AT OTHER LEVELS. I don't know what you are going to do. But if they don't stop THE POPULARES ARE GOING TO BE IN POWER FOR 30 YEARS. STOP THIS. This is crazy. I have a friend who is a close friend of RM's son, and they want to see me to deliver hard evidence to me and other media. This administration is fucked. I need to stop this.

(Docket No. 316 at pp. 66-67; see Trial Ex. 7-T.) Maceira informed the jury that these extortionate demands transpired in June and July 2019, at meetings where Díaz presented the problem (*i.e.* the son of a disgruntled government official in possession of incendiary messages), and its solution (*i.e.* hush money, renewal of Díaz's government contracts, and funds to purchase media coverage favorable to the Rosselló administration, all payable to Díaz).

Díaz also argues that the Court erred by "[allowing] the Government to present evidence regarding [his] multiple debts, which would entail fraud and kickbacks, which supported other criminal offenses not charged in the indictment." Brief for Appellant at 131-32. This argument disregards the trial evidence and the allegations in the indictment, which demonstrates extortion, as charged in the indictment.

Criminal No. 21-017 (FAB)                                                15

### 1. The Indictment

This criminal action concerned an alleged attempt to extort an official within the Roselló administration. The Spanish Broadcasting System, Inc. employed Díaz in an unspecified capacity "until on or about July 18, 2019." (Docket No. 1 at p. 1.) He purportedly served as a conduit between Raúl Maldonado-Nieves ("Maldonado-Nieves," or "Raúlie") and Anthony Maceira. Id. at pp. 1-3. Maldonado-Nieves is a former government subcontractor and the son of Raúl Maldonado-Gautier ("Maldonado-Gautier"), a former Secretary of Treasury during the Roselló administration. Id. at p. 1.

On February 3, 2019, Maldonado-Nieves and Díaz met at the latter's apartment to discuss Telegram messages containing "incriminating information about" the governor. (Docket No. 1 at p. 2.) At this meeting, Maldonado-Nieves showed Díaz a binder containing copies of the Telegram messages. Id. Four months after this meeting, Díaz texted Maceira the following message:

> Dude, if Fortaleza doesn't stop messing with [Maldonado-Gautier], [Maldonado-Nieves] has overwhelming evidence to fuck this Administration starting with [Governor Roselló]. According to [Maldonado-Nieves], it is you and Fortaleza behind the attack against [Maldonado-Gautier].

Id. at pp. 2—3.

Criminal No. 21-017 (FAB)                                                16

Díaz met with Maceira on June 21, 2019, at a restaurant in San Juan.  Id. at p. 3.  He informed Maceira that Maldonado-Nieves "had a binder full of Telegram messages that would destroy [Rosselló]" and his political party.  Id. at p. 3.  Díaz also "asked [Maceira] to help him with several government contracts through which he received compensation."  Id.

Media outlets published the Telegram messages on July 8, 2019.  Id. at p. 3.  The indictment avers that Díaz then attempted to "extort additional money from [Maceira] to prevent the release of additional Telegram messages."  Id.

On July 16, 2019, Díaz met with Maceira.  Id. at p. 4. Díaz revealed during this meeting that: (1) Maldonado-Nieves "possessed Telegram messages that had not yet been released publicly," (2) Maldonado-Nieves obtained the messages from his father's cellphone, (3) the unreleased messages "contained damaging information" about Governor Rosselló and Maceira, (4) Maldonado-Nieves "intended to 'burn down Puerto Rico,' by releasing these Telegram messages unless [he] received approximately $300,000," and (5) Díaz offered to accept this payment "through a corporation that [he] owned and did not have any contracts with the government."  Id.  In addition to the demand for $300,000, Díaz attempted to extort a "talent" fee, payment for favorable commentary about the administration and the governor by

Criminal No. 21-017 (FAB)                                                16

Díaz met with Maceira on June 21, 2019, at a restaurant in San Juan.  Id. at p. 3.  He informed Maceira that Maldonado-Nieves "had a binder full of Telegram messages that would destroy [Rosselló]" and his political party.  Id. at p. 3.  Díaz also "asked [Maceira] to help him with several government contracts through which he received compensation."  Id.

Media outlets published the Telegram messages on July 8, 2019.  Id. at p. 3.  The indictment avers that Díaz then attempted to "extort additional money from [Maceira] to prevent the release of additional Telegram messages."  Id.

On July 16, 2019, Díaz met with Maceira.  Id. at p. 4. Díaz revealed during this meeting that: (1) Maldonado-Nieves "possessed Telegram messages that had not yet been released publicly," (2) Maldonado-Nieves obtained the messages from his father's cellphone, (3) the unreleased messages "contained damaging information" about Governor Rosselló and Maceira, (4) Maldonado-Nieves "intended to 'burn down Puerto Rico,' by releasing these Telegram messages unless [he] received approximately $300,000," and (5) Díaz offered to accept this payment "through a corporation that [he] owned and did not have any contracts with the government."  Id.  In addition to the demand for $300,000, Díaz attempted to extort a "talent" fee, payment for favorable commentary about the administration and the governor by

"other well-known individuals" in the media. Id. at p. 4. Lastly, Díaz requested the reinstatement of his government contracts with the Puerto Rico Department of Treasury and the Puerto Rico Office of Management and Budget. Id. These contracts inured to Díaz's financial benefit. Id. In fact, Díaz later sent Maceira a Telegram message to identify the relevant companies with expired government contracts. Id. Ultimately, Díaz attempted to obtain on behalf of Maldonado-Nieves and himself: (1) $300,000 in hush money, (2) a talent fee, and (3) the reinstatement of certain government contracts that Díaz previously had with Rosselló administration. Maceira declined Díaz's offer. Id.

FBI agents contacted Díaz on July 26, 2019. (Docket No. 107.) After this meeting, he purportedly "deleted Telegram messages [between Maceira and him] containing information about his involvement in the scheme, before surrendering his cellular phone to the authorities." (Docket No. 107 at p. 2.)

**2. The Trial Evidence**

The evidence presented at trial tracked the allegations set forth in the indictment. Maceira testified that Díaz demanded $300,000 to prevent the publication of the damaging chats, substantiating the extortion allegations in counts one and two. Evidence of Díaz's financial hardship and association with the Collective Impact and Social Consulting contracts is relevant to

Criminal No. 21-017 (FAB)                                           18

prove the offenses set forth in the indictment. The grand jury alleged that Díaz "asked [Maceira] to help him with several government contracts through which he received compensation." Id. The admission of evidence regarding these "government contracts" cannot sustain a reversal on grounds of a prejudicial variance because this conduct was specifically alleged in the indictment.

Díaz contends that the United States "amended the indictment and presented evidence to support a different crime; that [he] was to be the beneficiary of the $300.000, not Raulie." Brief for Appellant at 133.  The indictment and evidence presented at trial are consistent, however, conveying identical theories of criminal liability. The indictment explicitly identifies Díaz as the intended beneficiary of the $300,000.  (Docket No. 1.)  Count one alleges that "Díaz-Colón attempted to obtain property from [Maceira], and others, with consent, induced by wrongful use of fear."  Id. at p. 5.  Similarly, count two avers that "Díaz-Colón would facilitate the publishing of Telegram messages containing damaging information about [Maceira] and others unless Díaz-Colón received $300,000 and other things of value." Id. at p. 6.  The trial evidence aligns with these allegations, establishing that Díaz attempted to extort the $300,000 on his own behalf.

Criminal No. 21-017 (FAB)                                           19

**E. The Jury Instructions**

According to Díaz, the Court "erred by failing to instruct the jury that mere conversations, or contemplation to commit the offense, without more, cannot form the basis for a conviction for attempt, in addition to the fact that the contracts in question were non-transferable." Brief for Appellant at 143. He sets forth no analysis regarding this argument. "A party may not merely mention a possible argument in the most skeletal way, leaving the Court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Accordingly, Díaz's argument regarding the jury instructions is waived and unavailing.

Failure to satisfy the third prong of the section 3143(b) analysis negates the need to address risk of flight or alleged attempts to delay. Judicial restraint compels this Court to resolve only those issues that are dispositive to a dispute. See Ortiz-Carrasco, 863 F.3d at 4 ("[J]udges – unlike academicians – are not at liberty to scratch every intellectual itch."); Valley Forge Ins. Co. v. Health Care Mgmt. Ptnrs, LTD., 616 F.3d 1086, 1094 (10th Cir. 2010) ("Judicial restraint, after all, usually means answering only the questions we must, not those we can.") (citing PDK Labs., Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)

("If it is not necessary to decide more, it is necessary not to decide more.")); see e.g., Magee v. Harshbarger, 16 F.3d 469, 472 (1st Cir. 1994) ("Because the cause and prejudice requirement is conjunctive, we need not consider the latter element where the former has not been satisfied.").  Accordingly, the Court need not determine whether Díaz poses a danger to the safety of others or is likely to flee.

## IV. Conclusion

For the reasons set forth above, Díaz's motion for bail pending appeal is **DENIED**.  (Docket No. 478.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 9, 2024.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE